## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| MELYNDA BUENO-DOMINGUEZ, ) | |
| ) | **No. 13 CV 1637** |
| Plaintiff, ) | |
| ) | |
| v. ) | **Magistrate Judge Young B. Kim** |
| ) | |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner, Social Security ) | |
| Administration, ) | |
| ) | **March 9, 2015** |
| Defendant. ) | |

### MEMORANDUM OPINION and ORDER

Melynda Bueno-Dominguez seeks disability insurance benefits ("DIB") based on her claim that she is disabled by low back pain and other difficulties stemming from degenerative disc disease in her lumbar spine. After the Appeals Council declined to review an administrative law judge's ("ALJ") decision denying her applications, Bueno-Dominguez filed this suit seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court are the parties' cross-motions for summary judgment. For the following reasons, Bueno-Dominguez's motion for summary judgment is granted to the extent that the case is remanded for further proceedings and the government's motion is denied:

### Procedural History

In October 2010 Bueno-Dominguez filed an application for a period of disability and DIB, claiming a disability onset date of July 21, 2008. (Administrative Record ("A.R.") 219.) After her claims were denied initially and

upon reconsideration, (id. at 148-49), Bueno-Dominguez requested and was granted a hearing before an ALJ. That hearing took place on June 6, 2012. (Id. at 115-47.) On June 20, 2012, the assigned ALJ denied Bueno-Dominguez's application. (Id. at 110.) The Appeals Council declined review, (id. at 1-5), making the ALJ's decision the final decision of the Commissioner, *see Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). In March 2013 Bueno-Dominguez filed this lawsuit seeking judicial review of the Commissioner's decision. *See* 42 U.S.C. § 405(g). The parties have consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); (R. 11).

## Facts

Bueno-Dominguez is a thirty-five-year-old mother of three who has experience working as a bank teller, telemarketer, EKG technician, and medical assistant. She has endured intermittent low-back pain since her early teens, when she injured her back while playing soccer. Bueno-Dominguez claims that her disability began in July 2008, the month she had surgery aimed at resolving her on-going lower back pain and associated complaints. At her June 2012 hearing before an ALJ, Bueno-Dominguez presented documentation and testimony in support of her claim that her condition continued to worsen after 2008 and that she remains unable to work in any capacity.

## A.    Medical Records

On her doctor's referral, in July 2008 Bueno-Dominguez consulted with spine surgeon Dr. John Mazur to discuss surgical treatment for her low-back pain. (A.R. 316-18.) Bueno-Dominguez reported that she had experienced intermittent

back pain since her adolescent soccer injury, but that for the previous three weeks it had worsened, causing right buttock and right thigh pain as well as numbness in her right foot. (Id. at 316.) An MRI conducted that same day showed that she had a large central L4-L5 disc herniation. (Id. at 316, 334.) Dr. Mazur physically examined Bueno-Dominguez and noted that she had mild low back pain on forward flexion to 60 degrees and on straight leg raising on the right side at 20 degrees and 10 degrees on the left. (Id. at 318.) He noted that she had a "cautious gait" with a slight limp favoring her right leg. (Id.) Dr. Mazur recommended that Bueno-Dominguez undergo a lumbar laminectomy, which she did on July 21, 2008. (Id. at 315, 318.)

Just over a month after her surgery Bueno-Dominguez reported that she was experiencing sporadic pain in her right buttock, especially after being on her feet at work. (Id. at 315.) Dr. Mazur performed straight leg raising tests and noted that she had pain at 60 degrees on the left side and 30 degrees on the right. (Id.) Dr. Mazur wrote that he was "not sure" where her pain was coming from and recommended physical therapy. (Id.)

On September 10, 2008, Bueno-Dominguez sought emergency care after falling on a sidewalk. (Id. at 506-07.) The ER doctor noted that she could walk without difficulty and had good flexion, but that she had pain with straight leg raises at about 40 degrees. (Id. at 507.) He ordered an x-ray which showed that her lumbar spine was within normal limits, but had a loss of disc height at L4-L5.

(Id. at 484, 507.)  Bueno-Dominguez was sent home with a work excusal and prescriptions for pain medication.  (Id. at 507.)

In May 2010 Bueno-Dominguez submitted to a lumbar spine MRI which revealed mild disc degeneration with slight loss of disc height at L3-L4, and moderate loss of disc height with secondary degenerative end plate marrow changes at L4-L5.  (Id. at 336.)  Both of those conditions had worsened since the previous MRI and there was evidence of dehydration in the bottom three discs.  (Id.)  But the reviewing doctor saw no evidence of nerve root displacement or spondylolisthesis and noted that her neural foramina appeared normal.  (Id. at 336-37.)

In the summer of 2010 Bueno-Dominguez sought treatment from Dr. James Fister, an orthopedist, after experiencing increased pain and numbness in her foot. (Id. at 332.)  She also reported to Dr. Fister that multiple times a day she was experiencing "electrical shocks" in her back that would cause it to buckle and lead to her falling down.  (Id. at 330.)  After reviewing her MRI reports, Dr. Fister wrote that her back pain was "probably from motion at the multi-level lumbar disc degeneration involving the bottom 3 lumbar discs."  (Id. at 332.)  He noted that she had engaged in extensive physical therapy sessions which did not help relieve her symptoms.  (Id. at 330.)  Dr. Fister physically examined Bueno-Dominguez and noted that she experienced some pain in bending down, but had negative straight leg raising tests.  (Id.)  He recommended that she get an opinion on whether she would be a candidate for disc replacement.  (Id. at 329.)

After visiting doctors in late 2010 and 2011 for issues with nausea and lightheadedness that were apparently unrelated to her back issues, (see, e.g., id. at 511, 540, 546), Bueno-Dominguez underwent a disability examination with consulting doctor Seth Osafo in February 2011. (Id. at 515-18.) Dr. Osafo wrote that there were no records available for his review, so his report was based on Bueno-Dominguez's self-reports and his physical examination. (Id. at 515.) Bueno-Dominguez reported that she had daily lower back pain that was aggravated by prolonged sitting, bending, and standing. (Id.) Dr. Osafo noted that she ambulated without an assistive device or limp and that her lower extremity strength was normal. (Id. at 515, 517.) He described her back pain as "clinically stable," and wrote that Bueno-Dominguez was able to sit, stand, walk, carry, and handle objects without limitation. (Id. at 517.)

In March 2011 Bueno-Dominguez had a CT scan of her lumbar spine. (Id. at 547). The reviewing doctor wrote that the MRI findings from May 2010 "are fairly stable including some mild degenerative disc disease at L4-L5." (Id.) She wrote that there was some mild bilateral neural foraminal narrowing at the L4 level, but no evidence of spondylolisthesis. (Id. at 548.)

The next relevant medical records are from early 2012, when Bueno-Dominguez reported to her primary care physician, Dr. Deepak Patel, with what she described as constant and worsening hip pain. (Id. at 585.) In January 2012 Dr. Patel noted that she reported numbness in her pelvic region and incontinence. (Id.) Dr. Patel examined her and recorded her lower extremity strength and gait as

being normal, but her flexion on a back bend was 10 degrees and her straight leg raising test was positive. (Id. at 585-86.) He included in his notes a "working diagnosis" of cauda equina syndrome and advised her to be evaluated by the emergency room as soon as possible. (Id. at 585.) After a follow-up visit in February 2012 Dr. Patel noted that Bueno-Dominguez reported no incontinence and that the emergency department had recommended she consult with a neurosurgeon. (Id. at 583.) He changed his diagnosis from cauda equina syndrome to sciatica and backache, noted there were no changes in her symptoms, and recommended physical therapy. (Id.) Bueno-Dominguez's records show that she followed through with that plan and attended multiple physical therapy sessions in February and March 2012. (Id. at 570-79.) Bueno-Dominguez returned to Dr. Patel in June 2012, again complaining of incontinence. (Id. at 581.) Dr. Patel described her incontinence as being associated with her back problems and numbness. (Id.)

B.    **Opinions of State Consulting Physicians**

Bueno-Dominguez's records also include residual functional capacity assessments ("RFCs") developed by state consulting physicians. In February 2011 medical consultant Dr. James Madison reviewed her file and opined that Bueno-Dominguez is able to sit, stand, and walk for six hours in an eight hour day, and occasionally do things like balancing, stooping, and kneeling. (A.R. 524-25.) In explaining his opinion, he wrote that Bueno-Dominguez's allegations are only partially credible based on inconsistencies between the medical records and her daily activities and her claim that she needs a cane although the consulting

examiner noted that she does not need an assistive device.  (Id. at 528.)  In July 2011 Medical consultant Dr. Charles Kenney largely adopted Dr. Madison's findings.  (Id. at 560.)

## C.    Bueno-Dominguez's Hearing Testimony

At her hearing before the ALJ, Bueno-Dominguez testified that she has a high school education but was attending classes on a part-time basis with the goal of getting a nursing degree.  (A.R. 119.)  She testified that she only takes one class at a time as a way to get out of the house, and that it is difficult for her to sit or stand for a long time.  (Id. at 120.)  She needs to get up during class and walk around to alleviate her back pain.  (Id. at 138.)  Bueno-Dominguez explained that getting her nursing degree is a personal goal but that she did not think she would be able to work as a nurse.  (Id.)

When asked to describe her pain, Bueno-Dominguez testified that despite being on medications her pain is "pretty much constant."  (Id. at 124-25.)  She said that her back sometimes buckles when she has been moving around too much, sending a "sensation like an electrical shock" through her back.  (Id. at 125.)  Bueno-Dominguez testified that if she is not holding onto something when that happens, she falls.  (Id.)  She said that she falls often, has difficulty with stairs, and uses a cane when she is going to be somewhere that does not have places she can grasp to prevent a fall.  (Id.)  According to her, a physical therapist prescribed the cane. (Id. at 127.)  Bueno-Dominguez testified that she can sit for about 45 minutes and lift nothing heavier than a gallon of milk.  (Id. at 131.)  She said that if she lifts

anything heavier she will get a jolting sensation down her back and her back will buckle. (Id.) She described having difficulty bending and said that if she drops something, she needs help to pick it up. (Id. at 136.) Bueno-Dominguez testified that over the course of a week she has two good days and five bad, and that on a good day her pain level is a five or six out of ten, while her pain level on bad days is a nine. (Id. at 126.)

Bueno-Dominguez also explained that she has numbness in her leg and sometimes in her pelvic area, which can lead to episodes of incontinence. (Id. at 126-27.) She said the incontinence started around February 2012, but that she had been experiencing numbness for over a year. (Id. at 127.) Bueno-Dominguez described her incontinence as being intermittent and unpredictable. (Id. at 134.) The numbness interferes with her ability to walk, limiting her to 15 or 20 minutes of walking at a time when she uses her cane. (Id. at 130.) It also limits her ability to drive, because if she tries to drive for more than 20 miles her foot becomes numb and she is unable to lift her foot to switch pedals. (Id.)

In describing her daily activities, Bueno-Dominguez testified that she goes grocery shopping with her husband, but if she is out for a long time her back starts to buckle. (Id. at 126.) On an average day she helps her children get ready for school, attends her nursing class, and folds laundry. (Id. at 129.) Her husband drives her back and forth to class and she expressed guilt about how much her children help around the house. (Id.) She said that her husband switched to

working a later shift because she kept having so many falls and he wanted someone to be home with her at all times.  (Id. at 135-36.)

## D.    The ALJ's Decision

On June 20, 2012, the ALJ issued a decision finding that Bueno-Dominguez is capable of performing her past relevant work as a bank teller, telemarketer, EKG technician, or medical assistant, and accordingly, she concluded that Bueno-Dominguez is not disabled within the meaning of the Social Security Act.  (A.R. 100-110.)   In applying the standard five-step sequence for assessing disability, *see Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012), the ALJ found at steps one and two that Bueno-Dominguez has not engaged in substantial gainful activity since July 21, 2008, and that she suffers from severe impairments including degenerative disc disease, status post discectomy, sciatica, nonspecific mild platelet dysfunction, and obesity.  (A.R. 102.)  The ALJ did not include urinary incontinence among those impairments, because she found it to be a condition that had not lasted for the required 12 months.  (Id. at 105.)  At step three the ALJ determined that none of Bueno-Dominguez's physical impairments meets or equals a listing.  (Id. at 105-06.) The ALJ specifically considered Listing 1.04 for disorders of the spine, but concluded that she does not meet that listing because, for example, there was no evidence of spondylolisthesis or of significant nerve compression, her straight leg tests were negative, and she was able to walk without a limp and without using an assistive device.  (Id. at 105.)

Before turning to step four of the required analysis, the ALJ determined that Bueno-Dominguez has the RFC to perform light work with some postural limitations. (Id. at 106.) In support of that conclusion, the ALJ wrote that the medical records do not support the extent of the limitations Bueno-Dominguez described at the hearing, citing negative straight leg test results and evidence of her normal muscle strength and ability to walk. (Id. at 107.) She adopted the RFCs prepared by the two state consulting physicians, declaring them to be "most consistent with the medical and other evidence." (Id. at 108.) In explaining her adverse credibility findings, the ALJ wrote that the medical records do not suggest a significant worsening in her condition or support her claim to have regular or consistent falls. (Id. at 108-09.) Based on her RFC assessment, the ALJ concluded that Bueno-Dominguez is capable of performing her past relevant work. (Id. at 110.)

**E.     Post-Decision Evidence Submitted to the Appeals Council**

In the interim months between the ALJ's and the Appeals Council's decisions, Bueno-Dominguez's attorney sent two sets of medical records to the Appeals Council for its review. The first set is comprised of treatment notes from a visit to Dr. Fred Geisler on June 28, 2012, eight days after the ALJ issued her decision. (R. 18, Pl.'s Mem. Ex. 1.) Although Bueno-Dominguez's attorney sent those notes to the Appeals Council, the Council did not reference the notes in its decision denying review and the notes were never incorporated into the administrative record. (A.R. 2.) The second set is comprised of treatment notes

from a surgery that Bueno-Dominguez underwent in November 2012. (Id. at 6-21.) The Appeals Council wrote that it "looked at" those records, but that because the surgery happened after the period under the ALJ's consideration, the new records did not affect the ALJ's decision that Bueno-Dominguez was not disabled beginning on or before June 20, 2012. (Id. at 2.) The Appeals Council wrote that if Bueno-Dominguez wanted it to consider whether she was disabled after that date, she would need to file a new application. (Id.)

## Analysis

In her motion for summary judgment Bueno-Dominguez raises procedural challenges to the Appeals Council's decision denying her request for review and substantive challenges to the ALJ's adverse ruling. The Commissioner argues that the Appeals Council did not commit any remand-worthy errors and defends the ALJ's decision as being supported by substantial evidence. This court agrees with Bueno-Dominguez that several of the errors she has highlighted require that this case be remanded to the Commissioner for further proceedings.

## A.     The Appeals Council's Treatment of Supplemental Records

In presenting her two-part challenge to the Appeals Council's treatment of her supplemental medical records, Bueno-Dominguez first argues that its failure to acknowledge or incorporate into the administrative record her June 2012 treatment notes warrants what is known as a "sentence-six remand." The sixth sentence of 42 U.S.C. § 405(g) states that for good cause shown, the court may remand a case to the Commissioner for the consideration of "new evidence which is material." In

order to earn a sentence-six remand the claimant bears the burden of showing that the proffered evidence is new and material, and that she had good cause for not presenting the evidence during the administrative proceedings. *Sample v. Shalala*, 999 F.2d 1138, 1144 (7th Cir. 1993). The Appeals Council is required to evaluate new and material evidence in determining whether to review the ALJ's decision. *Farrell v. Astrue*, 692 F.3d 767, 771 (7th Cir. 2012). Where the Appeals Council has neglected that requirement, sentence six empowers the district court to remand the case without considering its merits so that the agency can evaluate the new, material evidence and decide whether, together with the rest of the record, it warrants review of the ALJ's decision. *DeGrazio v. Colvin*, 558 Fed. App'x 649, 652 (7th Cir. 2014); *see also Girondi v. Astrue*, No. 09 CV 3623, 2011 WL 1789810, at *7 (N.D. Ill. May 6, 2011) (finding sentence-six remand necessary where Appeals Council "simply ignored" new material evidence or "it was lost somewhere in the bureaucratic morass").

Here the government acknowledges that the Appeals Court overlooked the June 2012 treatment notes but argues that Bueno-Dominguez has not met her burden of showing that a sentence-six remand is necessary because, according to it, those notes are not material. (The government apparently concedes that because the treatment notes were not available before the ALJ's decision they were "new" when Bueno-Dominguez submitted them to the Appeals Council.) Specifically, the government argues that the records pertain to Bueno-Dominguez's condition on a day outside the relevant time period and that even if they relate to the relevant

time period the notes are not material because they reflect only mild or moderate objective findings. New evidence is "material" if there is a reasonable probability that the ALJ would have reached a different outcome if the evidence had been before her. *See Sears v. Bowen*, 840 F.2d 394, 400 (7th Cir. 1988). The regulation makes clear that new evidence may be material even if it was not generated during the relevant time period, because it is enough for the claimant to show that "it relates to the period on or before the date of the administrative law judge hearing decision." *See* 20 C.F.R. § 404.970(b); *Farrell*, 692 F.3d at 771.

The June 2012 records from Dr. Geisler's office stem from an examination he conducted of Bueno-Dominguez on June 28, 2012, just 22 days after her hearing before the ALJ and 8 days after the ALJ's decision. That minimal time lapse does not in itself render the records immaterial to the relevant period. *See Farrell*, 692 F.3d at 771 (finding that diagnosis confirmed one month after hearing date "relates to" relevant period); *Bush v. Astrue*, 571 F. Supp. 2d 866, 875-77 (N.D. Ill. 2008) (ordering sentence-six remand for consideration of records from within three months of the ALJ's hearing). And despite the government's argument that Bueno-Dominguez lacks good cause for the late submission because she could have seen Dr. Geisler before the hearing, it has not cited any authority to support its position that good cause hinges on a physician's appointment calendar. (R. 30, Govt.'s Resp. at 4.) Sentence six's good-cause requirement is designed to prevent "sandbagging" by a claimant who might seek out new treatments or opinions in an attempt to shore up her case after an adverse decision. *See Sears*, 840 F.2d at 400. Given that

there was only an eight-day lapse between the ALJ's adverse decision here and Bueno-Dominguez's examination by Dr. Geisler, the timing of her appointment does not suggest any attempt on her part to manipulate the proceedings before the agency. *See id.*; *Bush*, 871 F. Supp. 2d at 876.

Moreover, Bueno-Dominguez has shown that Dr. Geisler's notes relate substantively to the relevant time period. On their face, the June 2012 records represent more than a snapshot of Bueno-Dominguez's condition on the specific day she saw Dr. Geisler, because they include language recognizing her condition as an on-going and degenerative one. For example, Dr. Geisler incorporated into his evaluation diagnostic studies from March 2011 and January 2012 to inform his impression. (R. 18, Pl.'s Mem. Ex. 1 at 3.) He diagnosed her as having degenerative disc disease and degenerative joint disease, described her L4-5 and L5-S1 discs as being at "worse levels," and noted that her back pain is "persistent." (Id. at 4.) He specifically noted that he discussed with Bueno-Dominguez the anticipated progression of what he described as the degenerative changes that might require future medical treatment. (Id.) In all of these ways, the new evidence "speaks to the patient's condition at or before the time of the administrative hearing." *See Getch v. Astrue*, 539 F.3d 473, 484 (7th Cir. 2008). Accordingly, it "relates to the period" before the ALJ's decision. *See* 20 C.F.R. § 404.970(b).

As for the government's argument that the June 2012 records are immaterial because, according to it, they reflect only mild or moderate medical findings, that characterization ignores the doctor's new recommendation that Bueno-Dominguez

should undergo a second back surgery. To meet her burden of showing materiality Bueno-Dominguez does not have to demonstrate that it is more likely than not that Dr. Geisler's notes would have changed the outcome of the ALJ's decision. *See Willis v. Apfel*, 116 F. Supp. 2d 971, 976 (N.D. Ill. 2000). Instead, she just needs to show that there is a "reasonable probability that the Commissioner would have reached a different conclusion had the evidence been considered." *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997). Here, the ALJ based her RFC assessment in part on her observation that "the medical evidence of record does not provide objective support for a significant worsening of her condition" that would support her description of her limited daily activities. (A.R. 109.) The ALJ noted that since 2008 Bueno-Dominguez's only treatment had been medication and physical therapy. (Id.) But Dr. Geisler's notes recommending that Bueno-Dominguez undergo surgery show that the relatively conservative treatment the ALJ highlighted was insufficient and that there is objective support for the idea that her condition was worsening. In this way, Dr. Geisler's notes—which stem from his examination of Bueno-Dominguez during the same month as the ALJ's hearing—fill in an evidentiary gap that the ALJ held against Bueno-Dominguez in assessing her RFC. *See Farrell*, 692 F.3d at 771 (ordering remand where ALJ cited lack of diagnosis and new evidence provided that diagnosis). Although it is true as the government points out that Dr. Geisler wrote that her physical examination was unchanged since a July 2011 visit, he also wrote that her L4-5 and L5-S1 discs were at "worse levels" and advised surgical intervention. (R. 18, Pl.'s Mem. Ex. 1 at 3-4.)

There is at least a reasonable probability that the ALJ might have assessed Bueno-Dominguez's credibility differently had she known that three weeks after the hearing Dr. Geisler recognized that Bueno-Dominguez's condition had deteriorated to the point where she needed a second back surgery. Accordingly, Bueno-Dominguez has shown that a sentence-six remand is necessary to have the Appeals Council incorporate the evidence it overlooked previously and include that evidence in its evaluation whether to review the ALJ's decision.

Bueno-Dominguez's second challenge to the Appeals Council's treatment of her supplemental records is based on her argument that the Appeals Council erred in concluding that the November 2012 surgical notes have no impact on the question of whether she was disabled prior to June 20, 2012. In contrast to its failure to incorporate the June 2012 notes from Dr. Geisler, the Appeals Council explicitly discussed the November 2012 surgical notes and incorporated them into the administrative record. (A.R. 2, 6-21.) Accordingly, a sentence-six remand would not be appropriate for this set of evidence. *See Farrell*, 692 F.3d at 770. And normally, the Appeals Council's decision not to review an ALJ's decision is discretionary and unreviewable. *See Getch*, 539 F.3d at 483-84. But there is an exception where the Appeals Council makes an error of law with respect to its own regulations. *See Farrell*, 692 F.3d at 771. Here, the relevant regulation requires the Appeals Counsel to consider "new and material evidence" if it relates to the period on or before the date of the ALJ's decision. *See* 20 C.F.R. § 404.970(b).

Whether the Appeals Council has complied with that regulation is a question of law that this court reviews *de novo*. *See Getch*, 539 F.3d at 483.

The Seventh Circuit has explained that pursuant to the relevant regulation, in determining whether to consider newly submitted evidence, the Appeals Council has an obligation to: (1) assure itself that the evidence relates to the appropriate time period; (2) decide whether the submission qualifies as new and material; and (3) determine whether the new, material evidence undermines the ALJ's decision. *Perkins*, 107 F.3d at 1294. Here, the Appeals Council went no further than the first step. It wrote that it "looked at" the records from her November 2012 surgery, but concluded that because that evidence "is about a later time . . . it does not affect the decision about whether [Bueno-Dominguez was] disabled beginning on or before June 20, 2012." (A.R. 2.)

Bueno-Dominguez has not shown that this assessment of the November 2012 surgical records is erroneous. Bueno-Dominguez is correct that in an abstract sense, the surgical notes relate to her pre-June 2012 condition because they reflect treatment for the same condition she was complaining of in the relevant period. But in contrast to the June 2012 office notes, the November 2012 surgical notes reflect both a five-month gap from the relevant period and reveal on their face that the surgery was a reaction to a worsening of her condition that post-dated the ALJ's decision. The records state that Bueno-Dominguez "developed significant neurologic impairment with left LE pain, numbness, foot drop and urinary incontinence on 11/17/12 secondary to severe disk disease." (Id. at 10.) In the

narrative history the notes state that she has had those conditions "intermittently for years, but the full-blown pictures started in 2 months and got worse over the last week." (Id. at 12.) In other words, the notes themselves make clear that Bueno-Dominguez underwent the November 2012 surgery in reaction to her condition worsening significantly starting in September 2012. Accordingly, her attempt to link those notes to her pre-June 2012 condition is too tenuous to show that they relate to her condition during the relevant period. *See* 20 C.F.R. § 404.970(b). Although Bueno-Dominguez is entitled to file a new DIB application based on the November 2012 records, because they do not speak to her condition before the ALJ's decision, the Appeals Council did not err as a matter of law in finding that they are not material to the relevant time period. *See Kapusta v. Sullivan*, 900 F.2d 94, 97 (7th Cir. 1990).

**B.    The ALJ's Step-Three and Credibility Findings**

The Seventh Circuit has advised that even where a district court enters a judgment remanding a case to the agency to evaluate the effect of new evidence, the court "must conduct a full merits review to determine whether the agency committed other errors which would compel additional relief." *DeGrazio*, 558 Fed. App'x at 652-53; *Bush*, 571 F. Supp. 2d at 877 (remanding under sentence six but addressing remaining arguments attacking merits of ALJ's decision for the sake of completeness). Bueno-Dominguez argues that the ALJ committed such errors both in evaluating whether she meets the listing pertaining to spine disorders at step three of the required analysis and in evaluating her credibility in the course of the

RFC assessment. This court reviews the ALJ's decision only to ensure that it is supported by substantial evidence. *See* 42 U.S.C. § 405(g). In the course of that review the court considers "the record as a whole but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses." *Beardsley v. Colvin*, 758 F.3d 834, 836-37 (7th Cir. 2014). The court will remand, however, where the ALJ committed an error of law, overlooked evidence, or failed to develop an accurate and logical bridge between the evidence and her findings. *Id.*

Bueno-Dominguez argues that the ALJ overlooked evidence and misapplied Listing 1.04 in determining whether she is disabled at step three of the sequential evaluation process. At step three, a claimant will be found to be presumptively disabled if her condition meets or equals an impairment described in the Listing of Impairments. *See Kastner*, 697 F.3d at 646-47; 20 C.F.R. § 404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1. It is the claimant's burden to prove that her condition meets or equals a listed impairment. *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). Bueno-Dominguez argues that the ALJ improperly concluded that she does not meet the requirements of Listing 1.04(A), which describes disorders of the spine involving the compromise of nerve roots or the spinal cord where the following criteria are present:

> Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1.04(A).  To explain her conclusion that Bueno-Dominguez does not meet this listing, the ALJ primarily relied on: (1) her post 2008 surgery MRI showing no lumbar stenosis, spondylolisthesis, or nerve root compression; (2) the fact that examining physicians found no gait problems or difficulty with heel toe walking; a 2011 finding that she had normal muscle strength in her upper and lower extremities; and (3) negative results from straight leg testing performed in 2010 and 2011.  (A.R. 105.)

This court agrees with Bueno-Dominguez that the ALJ erred in overlooking evidence supporting her claim at this stage and in conflating criteria that apply to Listings 1.04(A) and 1.04(C) in concluding that she did not meet either subpart.  Of particular concern is that the ALJ honed in on two negative straight leg raise test results to justify her opinion while overlooking evidence of positive test results on at least five different dates spanning four years in the relevant period, as performed by three different doctors.  (See, e.g., id. at 315-16, 507, 584, 586.)  Although an ALJ need not discuss every bit of record evidence that supports a claimant's position, she may not simply "cherry-pick" evidence that supports her conclusion.  *See Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011); *Kastner*, 697 F.3d at 650 (noting that ALJ may not selectively consider medical reports in evaluating spinal disorders at step three).  It is true that the ALJ referenced some positive test results in her RFC discussion and that this court is to review her decision as a whole, *see Curvin v. Colvin*, __ F.3d __, No. 13-3622, 2015 WL 542847, at *3 (7th Cir. Feb. 11, 2015), but nothing in the RFC discussion sheds light on why the ALJ found the two negative

test results she mentioned at step three to be more indicative of the severity of Bueno-Dominguez's impairment than the positive results she referenced at the RFC stage. Also, much of the ALJ's step-three justification rests on her finding that Bueno-Dominguez has a normal gait and does not need an assistive device, but Listing 1.04(A) does not require evidence of gait disturbances. Rather, the inability to ambulate effectively speaks to Listing 1.04(C), which requires evidence of lumbar spinal stenosis. 20 C.F.R. Pt. 404, Subpt. P, App. 1.04(C). Because the ALJ seemed to have conflated the listing requirements and overlooked evidence that supports Bueno-Dominguez's claim for presumptive disability, the court is unable to determine that the ALJ properly considered all of the Listing 1.04(A) criteria and corresponding evidence in analyzing step three.

The ALJ's errors at step three would be harmless if it were obvious that Bueno-Dominguez does not meet the Listing 1.04(A) criteria, but here there is at least minimal support for her claim with respect to each criterion. Bueno-Dominguez consistently has been diagnosed with a disorder of the spine that impacts the spinal cord, in the form of degenerative disc disease. As for evidence of nerve root compression characterized by neuro-anatomic distribution of pain, in January 2012 her treating doctor noted a working diagnosis of cauda equina syndrome after she reported severe and worsening hip pain with incontinence. (A.R. 585.) Cauda equina syndrome is a condition involving the spinal nerve roots. Stedman's Medical Dictionary 328, 1892 (28th ed. 2006). Additionally, a 2011 CT scan showed mild bilateral neural foraminal narrowing. (A.R. 548.) There also is

some evidence that Bueno-Dominguez has limited motion of her spine based on examination results showing that she has difficulty bending and on Dr. Patel's notes documenting her decreased range of motion. (Id. at 318, 330, 469, 562.) Although at this stage of the analysis the ALJ cited only straight leg raising tests with negative results, (id. at 105), as discussed above, the record abounds with similar examinations presenting positive results, (id. at 315-16, 507, 584, 586). And although the government argues that the intermittent negative straight leg test results show that this aspect of her condition does not meet the 12-month durational requirement, it is the impairment itself that must be expected to last more than 12 months. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1509. The record conclusively shows that Bueno-Dominguez has suffered from degenerative disc disease for at least several years.

Bueno-Dominguez's showing is perhaps weakest with respect to the remaining criterion, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss. 20 C.F.R. Pt. 404, Subpt. P, App. 1.04(A). Her medical records consistently describe her as having normal strength. But there is also plentiful evidence showing that Bueno-Dominguez often experienced episodes in which her back "gave out" or "buckled," and her physical therapists cited as goals increasing her muscle strength to reduce her pain. (A.R. 570.) There is also ample evidence showing that she experienced sensory loss, given her repeated complaint to several doctors of numbness in her legs, feet, and pelvic region. (Id. at 332, 560, 581, 583, 585.) Although this evidence may or may not

support a finding that Bueno-Dominguez's spinal impairment meets or equals Listing 1.04(A), this court is unable to conclude that the ALJ's errors at step three were harmless. *See Schomas*, 32 F.3d at 707 (noting that harmless error doctrine applies only where court "can predict with great confidence that the result on remand would be the same"). Accordingly, on remand the agency should re-evaluate whether Bueno-Dominguez is presumptively disabled under Listing 1.04(A).

Finally, Bueno-Dominguez takes issue with the ALJ's credibility determination, arguing that the ALJ misunderstood the nature of her condition, overlooked evidence that supported her claimed symptoms, and put too much weight on her daily activities. Bueno-Dominguez's burden on this point is especially high, given that this court will not overturn an ALJ's credibility determination unless it is "patently wrong." *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). A credibility determination is patently wrong where it "lacks any explanation or support," *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008), or where it is marred by "fatal gaps or contradictions," *see Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010) (quotation omitted).

Bueno-Dominguez's strongest argument on this issue is her contention that the ALJ's credibility assessment reflects a misunderstanding of the nature of her condition. Specifically, Bueno-Dominguez points to the ALJ's assertion that there is no medical evidence showing a significant worsening of her condition between December 2010, when she completed a functional ability report, and the June 2012

hearing, when she reported what the ALJ interpreted as more severely limited daily activities. (A.R. 108-09.) But as Bueno-Dominguez points out, in 2012 she began reporting new symptoms of urinary incontinence associated with numbness, a condition that concerned her treating physician so much that he advised her to seek emergency treatment. (Id. at 585.) Although the ALJ acknowledged the evidence that Bueno-Dominguez experienced incontinence in 2012, she discarded it as describing a separate condition that does not meet the 12-month durational requirement. (Id. at 109.) In doing so, she was too quick to cabin the medical evidence into separate compartments without considering whether the new symptoms of incontinence and increased numbness actually demonstrated a worsening of Bueno-Dominguez's spinal condition. Accordingly, the court is concerned that one of the primary reasons the ALJ gave for discounting Bueno-Dominguez's credibility is based on a misunderstanding of her condition. *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (remanding where "the ALJ's credibility finding misstated some important evidence and misunderstood the import of other evidence").

Another problematic aspect of the ALJ's credibility determination is her finding that Bueno-Dominguez's reported daily activities are inconsistent with what her attorney and Dr. Patel described as her inability to bend or stoop. The ALJ writes, "the claimant's level of functioning and her activities of daily living do not support a complete inability to stoop, which is bending at the waist. The claimant sits, drives, and attends classes per her testimony." (A.R. at 109.) It is unclear

what sitting, driving, or attending a nursing class has to do with stooping. Apparently the ALJ decided that activities done in the seated position are inconsistent with an inability to stoop. But if sitting and stooping are the same thing, why would the agency's own RFC forms and regulations list them as separate functions? (See, e.g., id. at 524-25 (listing sitting as exertional limitation and stooping as postural limitation); *see also* 20 C.F.R. § 404.1569a (describing restriction in sitting as exertional limit on claimant's ability to meet strength demands and stooping difficulty as example of nonexertional postural limitation)).

Similarly, the ALJ doubted Bueno-Dominguez's testimony because, according to the ALJ, Bueno-Dominguez described her use of a cane as being "medically necessary" when the ALJ found no medical evidence to support that statement. (Id. at 109.) But Bueno-Dominguez did not describe the cane as being "medically necessary." She said that she uses it when she knows she is going to be in a place where she might not have something to grab on to if her back buckles and she feels like she might fall. (Id. at 125.) She said that a physical therapist advised her to use it. (Id. at 127.) The ALJ noted that there "is no evidence of this in the record," (id. at 108), but it is not clear that a physical therapist would record every scrap of advice offered to a patient in the course of treatment. The Seventh Circuit has cautioned ALJs against being suspicious of a claimant who uses a cane that is not medically prescribed. *See Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (noting that canes do not require prescription and faulting ALJ for discounting claimant's credibility based on use of cane suggested by physical therapist). And to

the extent the ALJ disbelieved Bueno-Dominguez's description of her pain because medical records consistently described her gait as normal, the Seventh Circuit recently made clear that an ALJ must explain why a claimant with back pain would be expected to limp before holding her normal gait against her. *See Adaire v. Colvin*, No. 14-1116, ___ F.3d ___, 2015 WL 678735, at *3 (7th Cir. Feb. 18, 2015).

Although this court's review of a credibility determination is necessarily deferential, *see Jones*, 623 F.3d at 1160, and not all of the ALJ's reasons have to be fully supported, *see Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009), here the holes in the ALJ's assessment are significant enough to sink the logical bridge between the evidence and her explanation. Accordingly, the court concludes that on remand the ALJ must reassess Bueno-Dominguez's credibility.

## Conclusion

For the foregoing reasons, Bueno-Dominguez's motion for summary judgment is granted, the Commissioner's is denied, and the case is remanded to the agency for further proceedings consistent with this opinion, including the consideration of additional evidence pursuant to sentence six of 42 U.S.C. § 405(g).

**ENTER:**

_____

**Young B. Kim**
**United States Magistrate Judge**